IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 4:01-cr-00077-SPM-AK

MICHAEL ANTHONY HUSBANDS,

　　　　Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 62, Motion to Vacate under 28 U.S.C. § 2255, by

Michael Anthony Husbands.  The Government has filed a response, Doc. 69, and Defendant has

filed a reply.  Doc. 70.  This cause is therefore in a posture for decision.  Having carefully

considered the matter, the Court recommends that the motion to vacate be denied.

## BACKGROUND

Defendant was charged by Indictment with one count of possession of firearms by a prior

convicted felon and one count of possession of stolen firearms.  Doc. 1.  This Indictment arose

from an arrest on state charges of armed burglary of a residence.  Presentence Report at 4.

The case proceeded to trial.  At the outset, without Defendant's presence, the

Government announced that it would not be calling Defendant's live-in girlfriend, Janna Harrell,

as a witness in its case-in-chief as it had originally planned.[1]  Doc. 34 at 28.  Although she was

"relevant to the government's case," Harrell was not available as a witness because she had been

indicted.  *Id*.  The Government's plan was to "go[ ] around that" by asking the officers who had

talked to her what they did after their discussions with Ms. Harrell.  *Id*.  Counsel for the

Government assured the Court that he had counseled his witnesses to avoid getting into any

hearsay evidence from her.  *Id*.  Defendant's attorney did not object to the Government's

decision regarding Harrell and did not engage in any on the record discussions regarding Harrell.

The most damaging witness against Defendant in the Government's case-in-chief was

David Graham, a detective in the burglary unit at the Leon County Sheriff's Office.  *Id*. at 94.

Detective Graham testified that he was assigned to investigate the August 15, 2001, burglary of

the Hester residence which "had been broken into forcibly and entered in the back door...."  *Id*. at

95.  He then described the particulars of the burglary:

> Prior to [the forcible entry] the suspect gained entry into their property by cutting
> a lock off of a gate that closes their property.  The suspect then drove a vehicle
> onto their property, gained entry into the residence, went into the residence and
> removed several firearms out of their master bedroom, some jewelry, went into a
> shed located behind their residence, took an outboard motor and went into a Jeep
> that was parked on their property and removed a Sony CD player, and then exited
> the property.

*Id*. at 95-96.

A subsequent search of a county database located some of the stolen jewelry at various

pawnshops.  *Id*. 97-101.  The name of the person who had pawned the jewelry was Janna Harrell.

*Id*.  Instant Defendant lived with Ms. Harrell at the address on the pawn ticket.  *Id*. at 99.  After

---

[1]The Court also notes that Ms. Harrell was not included in the Government's Intended
Witness List, which had been filed with the Court the previous day.  Doc. 14.

the detective confirmed with the victim that the jewelry belonged to her, he contacted Ms. Harrell "leaving her residence, and [another detective] conducted a traffic stop on that vehicle based on [his] probable cause for Ms. Harrell's arrest for pawning this jewelry." *Id*. at 102. Ms. Harrell consented to a search of her home where detectives "located...a large amount of jewelry in a small Gatorade container" matching the description of items taken from the Hester residence. *Id*. at 103. She was then placed under arrest, and after speaking with her, Detective Graham and Detective Michael Smith "went to the Gadsden County Jail and interviewed Mr. Michael Husbands." *Id*. at 104.

Detective Graham testified that before talking to Defendant he advised him of his rights. More specifically, he stated:

> We have a Miranda form that has his Miranda warnings on it, which I read him his rights directly off of that form, make sure that he understands what his rights are, have him sign the bottom initialing that he understands what they are, and that he is willing to talk to me voluntarily, which is what he did. He signed the form.

*Id*. at 105. The waiver of rights form was dated August 29, 2001. *Id*. When he began questioning Defendant, Detective Graham focused on the firearms burglary at the Hester residence and did not "tell him any of the facts of the burglary." *Id*. at 109. Instead, "In my interviewing techniques, I never tell the suspects anything about the burglary, just where it occurred. I have them tell me what happened, so that way you don't put things into their heard. You let them tell you about the crime." *Id*. According to Graham, the following occurred during the interview:

> On that particular date, after he was advised of his rights, Mr. Husbands stated that he had gained entry into the Hester residence by cutting the chain that secured the gate to their property using bolt cutters.

* * *

He said he then drove Ms. Harrell's–he was driving Ms. Harrell's car at the time. He drove her car on to the property. He pried open the rear door of their residence using a crowbar.

* * *

Once he was inside the residence, he removed the jewelry that was listed in this case and recovered two shotguns and two rifles from their bedroom, and also some financial documents, checks, credit cards, things of that nature.

* * *

He then exited the residence and went into a shed that was behind the residence and took an Evinrude motor and miscellaneous tools.

* * *

He loaded this property into his girlfriend's vehicle and returned to a Jeep that was parked at the residence.  He went in this Jeep and removed a Sony CD player from the Jeep.

* * *

[H]e got in his vehicle and left the area and he...said he placed the jewelry that he had stolen in a pillow case and placed it under the front seat of Ms. Harrell's vehicle.  He then left the area, went to Williams Road, which is...in Midway, Florida, drives down to the end of this road, where he traded this property for drugs.

* * *

[This property did not include] the credit cards or financial documents, and not the jewelry that was stolen in this burglary, but the Evinrude motor, the tools, the guns, which he said he never gets out of the car, he drives down there and people approach him at his vehicle, and he said they literally start fighting over the property.  He gets what he wants, they get what they want, and he leaves.

* * *

He basically said that [Ms. Harrell] was not involved in this, that she didn't take it, that he had taken this property, and that he knew–this was the first time that he

had taken guns in a burglary and that he knew he shouldn't have done it, mess with the guns, but he did.

* * *

He said his girlfriend...found [the jewelry] under the seat of the vehicle and had been wearing it, He asked her not to, but she said, "Anybody can have jewelry like this," and she continued wearing it.  And that was it.

* * *

He had indicated that he was a suspect in several other burglaries in the county and indicated to myself and Detective Smith that he could help us out a great deal with our burglaries that were going on in the county at that time, but he was wanting to make a deal to be able to not face charges in those other burglaries that he was a suspect in at the pawn shop–I mean at the other lawn cares and churches that we were having on the north, northeast side of town at that particular time....

*Id*. at 110-14.  Graham repeatedly denied supplying Defendant with any of the specifics of the crime.  *Id*.

Detective Graham further testified that although he took notes during the interview with Defendant, he had destroyed the notes after typing "the probable cause for the warrants, and what is stated here in the [typed report of the interview]...."  *Id*. at 115.  According to Graham, this is "common practice for [his] agency."  *Id*.

After the Government rested, Defendant took the stand in his own behalf.  According to him, on August 29 or 30, the detectives did not talk to him about the burglary of the Hester residence involving the firearms and jewelry but instead "[t]hey told [him] they were here to talk about stealing an air compressor and tiller from the Hester residence at a previous time...."  *Id*. at 133.  Defendant acknowledged that the detectives gave him his *Miranda* rights, but he maintained that because the detectives had "come and talked to me about a previous burglary which involved a tiller and air compressor" and because he knew the air compressor and tiller

were not stolen, "[t]hat's why I didn't mind signing the waiver and talking to him." *Id.* at 134-

35.  Defendant also testified that a few days after the burglary, before the interview regarding the

air compressor and tiller, he "got stopped on [a] traffic stop and was taken to special

investigations, where Detective Smith proceeded to interrogate [him] lengthily about the

burglary involving the firearms." *Id.* at 136.

In questioning Defendant, counsel paraphrased Detective Graham's testimony, and the

following occurred:

> Q.     Now you've also heard testimony today from Detective Graham that at
> some point after August 15th he went to Janna Harrell's, or he was on his
> way to Janna Harrell's residence, she was stopped, allowed him to search
> her home and **she pointed out this Gatorade container that's in front of
> you and said that that was jewelry inside that you had given her**.
>
> * * *
>
> Did you take that jewelry from Tobi Hester's bedroom?
>
> A.     No, sir, I didn't take it from her bedroom, and I didn't give it to Ms.
> Harrell either.

*Id.* at 138 (emphasis added).  He then denied telling Detective Graham that he "had taken all

those items and given the jewelry to Janna Harrell and taken the items to Williams Road in

Midway[.]"  *Id.*

On cross-examination, Defendant denied telling the detectives that he had committed the

Hester firearms and jewelry burglary, maintaining that "they made that up."  *Id.* at 143-45.

According to Defendant, Detective Smith told him "on another time they were going to get me

one way or another."  *Id.* at 145.

In rebuttal, Detective Michael Smith testified that several days after the firearms

burglary, he talked to Defendant regarding "several other burglaries in the area" and the Hester burglary. *Id.* at 158. At that time, however, he did not have the pawn shop information, and thus, he did not have any other information about Defendant's possible involvement in the Hester firearms burglary with which to confront him. *Id.* at 159. Detective Smith denied ever telling Defendant that he and Detective Graham wanted to talk to him about some other burglary at the Hester residence. *Id.* at 160. He maintained that Defendant's statements were "volunteered" and that Defendant stated the following after being advised of his rights:

> He said that his girlfriend, Ms. Harrell, had nothing to do with taking the jewelry and that he took it, and he went into detail describing how he cut the chain to the fence, pried the back door open, got the jewelry, the guns, et cetera, and the credit cards from the master bedroom, went out to the shed, took the boat motor, went to the Jeep, took the CD player, then he left.
>
> After he left, then he went and got rid of the property, except for the jewelry, he left up under the seat and just forgot about it. Then a couple days later he realized that Janna...was wearing the jewelry.

*Id.* at 160-61. Detective Smith maintained that Defendant never expressed "any misunderstandings as to what the purpose of the interview was," and that at no time during the interview did they ever discuss a tiller or tools that had been taken in some other burglary. *Id.* at 162-64.

The jury convicted Defendant on both counts, Doc. 18, and the Court subsequently sentenced him to 300 months imprisonment on Count One and 120 months on Count Two, to run concurrently. Docs. 25 & 28. Defendant appealed both his conviction and sentence. Doc. 26.

On appeal, Defendant argued that "he was denied a fair trial because there was no independent evidence to show his guilt." Doc. 43. He contended that the Government "improperly introduced testimonial evidence of his prior convictions and, in closing arguments,

questioned his credibility." *Id*.  The court of appeals concluded that the Government's "introduction of the fact that Husbands had prior felony convictions for burglary and the prosecution's closing argument did not result in denying Husbands a fair trial." *Id*.

Defendant alternatively "urge[d] the court to order all trials on charges of a felon in possession of a firearm to be bifurcated so that the jury is not told that a defendant has a prior conviction unless and until it decides whether he possessed a firearm." *Id*.  He subsequently withdrew that issue, but the court noted that even if it addressed the argument on its merits, Defendant would not prevail. *Id*.

Defendant then filed a *pro se* motion for new trial.  Doc. 45.  This motion was based on newly discovered evidence, more specifically, Defendant's 2002 acquittal on all state charges related to the pertinent burglary of the Hester home. *Id*.  The Court rejected Defendant's arguments, finding that he had "not provided any evidence that would go towards refuting" the elements of the firearms charges; thus, Defendant had not convinced the Court that a new trial "'would probably produce a different result.'"  Doc. 47.

Defendant appealed, arguing that the court abused its discretion in denying his motion for new trial "because the evidence of his acquittal in state court of burglary charges was newly discovered evidence, which would have refuted the elements of the crimes for which he was convicted and produced a different result."  Doc. 65.  The Eleventh Circuit concluded "that the evidence of Husbands's state court acquittal would not probably produce a different result at trial." *Id*.  The court reasoned:

> Because Husbands stipulated to his prior felony conviction and that the firearms traveled in interstate commerce, the only issue at trial was whether Husbands possessed the firearms.  The government's evidence regarding Husbands's

confession and the stolen jewelry was more than enough evidence to support the jury's conclusion that Husbands possessed the firearms.

*Id*.

The instant motion was filed shortly before the Eleventh Circuit's affirmance. In this motion, Defendant raises four claims that counsel was ineffective and a claim that the Government failed to disclose favorable evidence to the defense and that it used perjured testimony. Doc. 62. Each claim will be considered in turn.

## DISCUSSION

    I.        Ineffective assistance of counsel.

Because four of Defendant's claims involve allegations that his counsel was ineffective, a consideration of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate as an initial matter.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at 686. The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Id*. at 697. The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance

in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance.  *Strickland*, 466 U.S. at 689-90.  To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment."  *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001).  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions."  *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).  "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy."  *Chandler*, 218 F.3d at 1315 n.16.  "No lawyer can be expected to have considered all of the ways [to provide effective assistance]."  *Id*.  Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on.  The lawyer's strategy was course A.  And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.  Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*.  Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).  This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

A.      Failure to subpeona Janna Harrell.

In his first claim of ineffectiveness, Defendant maintains that counsel's "negligence" allowed the Government "to circumvent Mrs. Harrell's in court testimony when she was excused as a witness by [the Government] during a pre-trial hearing in which the defendant was not present."  Doc. 62, Mem. at 5.  In Defendant's view, counsel for the Government questioned the detectives "in such a creative way" that they "were acting as a transparent conduit for the introduction of the damaging inadmissible hearsay testimony of Mrs. Harrell, which it wanted to put before the jury." *Id*.  Defendant also claims that his absence from this hearing violated his due process right to be present at all stages of trial, as he would have "strongly objected and

asked for a continuance until Mrs. Harrell could be brought before the court."  *Id.*

The Court begins with the due process issue, which is an issue quite separate and apart from counsel's alleged ineffectiveness.  *See* Doc. 69 at 6-8.  The United States Supreme Court

> has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charges." Although the Court has emphasized that this privilege of presence is not guaranteed "when presence would be useless, or the benefit but a shadow," due process clearly requires that a defendant be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence."  Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.

*Kentucky v. Stincer*, 482 U.S. 720, 745 (1987) (quoting *Snider v. Massachusetts*, 291 U.S. 97, 105-08 (1934)).  The right to be present at every stage of trial "does not confer upon the defendant the right to be present at every conference at which a matter pertinent to the case is discussed, or even at every conference with the trial judge at which a matter relative to the case is discussed."  *United States v. Vasquez*, 732 F.2d 846, 848 (11th Cir. 1984).

In this case, Defendant was not present during the pretrial conference which the Court held immediately prior to the start of testimony to "review witness lineup once again and see where we are in estimates of time...."  Doc. 34 at 25.  The relevant question is whether this pretrial conference was a critical stage of the proceedings such that Defendant's "presence would contribute to the fairness of the procedure."  *Stincer*, 482 U.S. at 745.  In this Court's view, Defendant's presence would have been useless at this hearing.  The original focus of the hearing was to establish the order of the witnesses and to give the Court an estimate of the length of their testimony, matters which are routine and *pro forma* in every case, both civil and criminal.

During the course of tending to these housekeeping matters, the Fifth Amendment issue arose

with regard to Ms. Harrell.  Though neither the parties nor the Court addressed her unavailability

in constitutional terms, focusing instead on the evidentiary issues which were certain to arise,

Defendant's presence would not have promoted resolution of the issue.

Turning to the ineffectiveness issue, the focus becomes whether counsel acted deficiently

when he failed to call Ms. Harrell as a witness after the Government announced its intention not

to use her.  Counsel for the Government advised the Court that Ms. Harrell was "under

indictment," and although he did not tell the Court the nature of the indictment and its relevance

to this case–she had been indicted in state court for pawning the Hester jewelry–counsel for

Defendant was certainly aware of her role in the events leading up to Defendant's arrest.  The

Fifth Amendment unquestionably allowed for Ms. Hester to invoke her right to remain silent if

her fear of self-incrimination was well-founded, since the privilege plainly applies "in 'instances

where the witness has reasonable cause to apprehend danger' of criminal liability."  *United

States v. Smith*, 157 Fed. Appx. 215, 218 (11th Cir. 2005).  Because it is axiomatic that Ms.

Hester had more than reasonable cause to believe that her answers to any questions might

incriminate her in the state criminal proceedings, *Smith*, 157 Fed. Appx. at 217, the Court had

the discretion to refuse to allow her even to take the stand if it appeared she intended to claim the

right against self-incrimination since neither party is allowed to benefit from the witness' mere

assertion of the right.  *United States v. Tush*, 165 Fed. Appx. 742, 744 (11th Cir. 2006).  When

counsel's performance is evaluated with all of these circumstances in mind, the Court cannot say

that "no  competent counsel would have taken the action that his counsel did take."  *Grayson*,

257 F.3d at 1216.  It is highly improbable that Ms. Harrell's attorney would have allowed her to

forfeit her right to remain silent in the face of the pending criminal charges or that the Court

would have permitted her to be called just so she could invoke the Fifth Amendment.

Furthermore, although Defendant certainly could have objected and sought a continuance based

on Harrell's absence from trial, it is unlikely that the Court would have granted a continuance or

that it would have required Ms. Harrell's presence at the trial under the circumstances.

While it is facially appealing to surmise that the outcome of the federal trial would have

been different if Ms. Harrell had testified in this case as she did in Defendant's state court trial,

to show prejudice, Defendant must show more than simply that counsel's failure to call Ms.

Harrell might have had "some conceivable effect on the outcome of the proceeding." *Strickland*,

466 U.S. at 693.  Jury verdicts turn on myriad factors, and it is impossible to say that there is a

reasonable probability that, but for counsel's failure to call Ms. Harrell as a witness, the result of

the federal trial would have been different.[2]

In short, counsel was not ineffective for failing to subpoena Ms. Harrell.

B.      Failure to request *Jackson v. Denno* hearing regarding voluntariness of confession.

In this claim, Defendant argues that his attorney was ineffective for failing to seek a

*Jackson v. Denno* "hearing after [Defendant] told defense counsel that he did not make the

confession."  Doc. 62, Mem. at 8.  In *Jackson v. Denno*, the United States Supreme Court stated:

> It is now axiomatic that a defendant in a criminal case is deprived of due process
> of law if his conviction is founded, in whole or in part, upon an involuntary
> confession, without regard for the truth or falsity of the confession, and even

---

[2]Indeed, Defendant himself acknowledges in the next section of his supporting
memorandum that "[t]here can be no doubt that [Defendant's] conviction rest[s] partially if not
wholly on [his] alleged confession put before the jury by Detectives Graham and Smith."  Doc.
62, Mem. at 8.

> though there is ample evidence aside from the confession to support the
> conviction.  Equally clear is the defendant's constitutional right at some stage in
> the proceedings to object to the use of the confession and to have a fair hearing
> and a reliable determination on the issue of voluntariness, a determination
> uninfluenced by the truth or falsity of the confession.

*Jackson v. Denno*, 378 U.S. 368, 376-77 (1964).  According to Defendant, he "denied that he made

a confession when he was forced to take the stand at defense counsel's urging.  This being his only

means to put up a defense to the alleged confession presented by both Detectives," testimony which

Defendant describes as "suspect."  Doc. 62, Mem. at 8-9.  Defendant provides no details whatsoever

regarding the content or context of his conversations with his attorney in this regard beyond this

reference to his trial testimony, and he does not explain how his confession was involuntary, arguing

instead that the officers fabricated his confession.

       Defendant has come forward with nothing to suggest that the statement was coerced,

unknowing, or involuntary.  He has not even made any allegations, muchless offered any proof, that

either officer made promises or threats or trickery to extract the details in the official report.  Rather,

he maintains that the confession was entirely fabricated.  With that in hand, the issue for resolution

was who to believe, the officers or Defendant.  Even if counsel had filed a motion to suppress, there

is nothing presently before this Court to even suggest that the Court would have remotely considered

suppressing the statement since there was no issue of voluntariness but rather an issue of credibility.

The resolution of that issue was plainly for the fact-finder.  Thus, Defendant would have gained

nothing from filing a meritless motion, an act of futility which *Strickland* does not require.  Indeed,

as an officer of the Court, counsel is expected to use his best and most reasonable judgment not to

waste judicial resources arguing frivolous points.  Arguing that the confession was involuntary, when

the real question plainly involved a determination of credibility, would certainly have been an

unreasonable path for counsel to take.  This ground of ineffectiveness is wholly without merit.

      C.      Failure to object to officers' testimony regarding "criminal allegations."

      In his third claim that counsel was ineffective, Defendant maintains that counsel improperly failed to "object on at least eight separate occasions when government witnesses, Graham and Smith, destroyed [Defendant's] image by use of criminal allegations which were nothing more than unsubstantiated innuendo."  Doc. 62, Mem. at 11.  According to Defendant, the "most devastating testimony suffered" by him "portrays him as the perpetrator of numerous church burglaries," burglaries which were the subject of much media coverage.  *Id*. at 11-12.  As previously outlined, Detective Graham testified that Defendant himself broached the subject of his suspected involvement in "several other burglaries in the county" and that Defendant indicated to the officers that he could "help [them] out a great deal" with their investigations.  According to Detective Graham, in exchange for his cooperation, Defendant wanted "to make a deal to be able to not face charges in those other burglaries that he was a suspect in...."

      As the Government points out, these statements were part and parcel of Defendant's alleged confession to the Hester firearms burglary and were integral to any argument that the confession was less than voluntary, and thus, even if counsel had objected to this portion of the confession, it is highly unlikely the Court would have redacted these statements.  Furthermore, defense counsel's decision to elicit Defendant's prior burglary convictions on direct examination was perfectly reasonable.  There is no doubt whatsoever that these matters would have been thoroughly explored on cross-examination, even if counsel had ignored the prior convictions during his direct examination.  The substantive issues underlying this claim of ineffectiveness was raised on appeal and rejected by the Eleventh Circuit, which, as previously noted, found that the Government's

"introduction of the fact that Husbands had prior felony convictions for burglary and the prosecution's closing argument did not result in denying Husbands a fair trial." Doc. 43. If there was no substantive error, there can be no ineffective assistance.

> D.      Failure to act as advocate when presented with evidence beneficial to Defendant.

In his final claim of ineffectiveness, Defendant argues that counsel improperly failed "to make an issue of Mrs. Harrell and [Defendant's brother] being together leaving the same residence which contained the remainder of the Hesters' stolen jewelry." According to Defendant,

> Counsel's ineffectiveness is evident when he fails to comprehend the relevance of Detective Smith's testimony. The fact that defendant's alleged girlfriend was leaving her house with the defendant's brother should have been emphasized in defense counsel's closing argument. This could have been accomplished by asking the jury to consider "What could these two individuals be doing together?" Following this question he should have refreshed the jury's memory with the prior testimony that these were two brothers whom did not associate, and that defendant's brother was the same individual who was present at the crime scene when officers arrived and it was he who had proceeded to list [Defendant] as a suspect. He could have also pointed out for the jury that it was [Defendant's brother], not [Defendant], who was familiar with the Hesters' rottweilers, as well as their daily schedule and the interior of their home.

Doc. 62, Mem. at 16-17. Defendant states that he questioned counsel after the verdict as to why he neglected to make this an issue, and counsel replied, "'We both know that your brother would not be at Mrs. Harrell's house and that it was obvious...that the detective was mistaken and meant to say Mrs. Harrell's brother.'"  *Id*. at 16. Defendant argues that counsel's "personal assumption as to whom was actually with Mrs. Harrell could have netted [Defendant] the 25-year sentence he is now serving." *Id*. at 17.

At both the federal and state trials, Detective Smith testified that when Ms. Harrell was arrested in possession of the Hester jewelry, she was in the company of either Defendant's brother

or his brother-in-law.  Doc. 34 at 166-67; Doc. 62, Mem. Ex. at 42.  The officer was "not sure."

Doc. 34 at 166.  Counsel did not press him further, and accepting Defendant's representation of the

conversation as true and accurate, counsel's explanation to Defendant that he believed the detective

misspoke is entirely reasonable, especially in light of Detective Graham's testimony that Ms. Harrell

was with her brother, not Defendant's brother, when she was stopped.  *Id*. at 119.  Defendant's

suggestion that counsel's failure to press the detective further, when the detective admitted he was

"not sure" who was with Ms. Harrell, and then to make this an issue during closing arguments

"could have" resulted in his conviction is totally speculative and shows nothing more than that it

might have had "some conceivable effect on the outcome of the proceeding."  *Strickland*, 466 U.S.

at 693.  Such a tenuous connection hardly meets the *Strickland* requirement of a  "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  *Id*. at 694.  This claim is also without merit.

     II.     Government's failure to disclose favorable evidence and use of  perjured testimony.

     In this claim, Defendant argues that a fingerprint report beneficial to Defendant was either

withheld by the Government or counsel was ineffective for failing to "produce the fingerprint report

as evidence or to call Officer Simpson to testify...."  Doc. 62, Mem. at 14.  He also contends that a

statement by the Government's counsel that there were "no fingerprints found of anybody amounts

to perjured testimony" based on Detective Simpson's state court testimony that he did "lift some

latent prints" at the Hester residence but that he could not identify to whom they belonged.  *Id*.; *see

also id*., Mem. Ex. at 19.

     On cross-examination, defense counsel and Detective Graham engaged in the following

exchange:

Q.      Do you know if Deputy Simpson did any fingerprint collection?

A.      I believe he processed the scene for fingerprints, yes, sir, I believe so.

Q.      And to your knowledge, are there any reports of fingerprints of Michael Husbands being at the scene.

A.      No, sir, not that I'm aware of.

* * *

Q.      Does [the orange Gatorade container] have Mr. Husbands' fingerprints on [it]?

A.      No, sir.

Doc. 34 at 118 & 120.

During closing arguments, counsel for the Government stated:

Fingerprints.  Were there fingerprints?  No, there weren't any fingerprints found of anybody, including Ms. Hester or Ms. Harrell, who had stowed away the jewelry in this container.  The fact is that fingerprints can't be located on everything.  We don't know if the person who did the burglary wore gloves.  We don't know if the person touched something square enough to leave a print that's identifiable, or whether there were smudges.  Suffice it to say that there were a number of prints that were taken, but none were developed and none were valuable to this case.  But simply because there weren't any prints of the defendant in that house, or makable on him, doesn't mitigate against his guilt.  There are other explanations as to why there may not have been fingerprints of anything.

Doc. 34 at 183.  In response, defense counsel argued:

There's no fingerprints.  And contrary to what the government has told you, I don't think there were no fingerprints at all, because I think you did hear testimony that they had a fingerprint analyst, technician, showed up at the scene.  He went around and dusted for fingerprints, but the...thing is, I believe it was Detective Graham said, there were not fingerprints that belonged to Michael Husbands.  And if there had been fingerprints belonging to Michael Husbands in the Jeep, in the doors to the house, somewhere inside that house, even on the jewelry that's inside this Gatorade container, you can bet your bottom dollar the government would be showing you that report saying Michael Husbands touched whatever it was.

*Id*. at 188.

There is nothing in the record to suggest that the Government did not provide counsel with the fingerprint report during discovery.  Indeed, the Court believes it highly unlikely that if counsel had not known Defendant's fingerprints were not found at the scene or on the jewelry recovered from Ms. Harrell that he would have questioned Detective Graham on this point at all.  Furthermore, in light of Graham's candid admission, submission of the actual fingerprint report, either as a means of impeachment or as substantive evidence through the fingerprint technician or analyst, was not required or necessary.  Finally, while the fingerprints portion of the Government's closing argument does appear, at first blush, to be a misrepresentation of the evidence, it hardly rises to the level of "perjured testimony," as Defendant suggests.  Counsel immediately corrected himself, and defense counsel took advantage of the Government's miscue.  Moreover, the Court plainly instructed the jury that "anything that the lawyers say is not evidence in the case [or] binding upon you," directing them instead that "your own recollection and interpretation of the evidence...controls."  Doc. 34 at 198.

In short, defense counsel was not ineffective and the Government did not "perjure" itself with regard to the fingerprint testimony or argument.

**CONCLUSION**

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion to vacate, Doc. 62, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this **7<u>th</u>** day of December, 2006.

s/ A. KORNBLUM
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**